IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CRAIG ZIMMERLEIN,                    )        FILED: MAY 06, 2008
Reg. No. K-68216,                    )
Dixon Correctional Center            )        08CV2595  LCW
                                     )        JUDGE LINDBERG
          Petitioner                 )        MAGISTRATE JUDGE DENLOW
                                     )
     vs.                             )   No.
                                     )
NEDRA CHANDLER, Warden,              )
Dixon Correctional Center            )
                                     )
          Respondent                 )

HABEAS CORPUS PETITION PURSUANT TO 28 U.S.C. SECTION 2254

     This is a Habeas Corpus Petition filed on behalf of a
State prisoner pursuant to 28 U.S.C. Section 2254.

Procedural History

     Defendant was convicted of murder and sentenced to 40
years. Defendant proceeded with a direct appeal which was
affirmed and a Petition for Leave to Appeal which was denied.
Petitioner then filed a Post-Conviction Petition which was
denied. He filed an appeal which was denied on July 30, 2007.
He then filed a Petition for Leave to Appeal to the Illinois
Supreme Court on October 17, 2007 which was denied on January
30, 2008.

     In his Petition for Leave to Appeal, he raised the
following issues:

          1.  Defendant was denied effective assistance of
     counsel where counsel failed to present available
     witnesses whose testimony would have raised reasonable
     doubt as to whether defendant was guilty of murder and

which would have caused the jury only to find defendant guilty only of involuntary manslaughter; that counsel's decision not to call these witnesses was ineffective assistance.

2.  Defendant was denied due process and defendant's Fourth Amendment rights when the Appellate Court on defendant's direct appeal applied a wrong standard for review, <u>i.e.</u>, manifest weight of the evidence instead of <u>de</u> <u>novo</u>.

The decision of the State courts are contrary in application to the United States Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 80 L.Ed.2d 674 and <u>Ornelas v. United States</u>, 517 U.S. 609, 134 L.Ed.2d 911.

Additionally, as to Point 2, the decision is contrary to the decision of the United States Supreme Court in <u>Ornelas v. United States</u>, 517 U.S. 609, 134 L.Ed.2d 911.

<u>Statement of Facts</u>

Defendant married the mother of Travis, a toddler, who suffered from many birth defects including Down's Syndrome.

Defendant was found guilty of murder under the theory that in an act of anger, defendant kicked the child which caused injury that caused death.

Involved in the post-conviction was the issue of whether defendant received effective assistance of trial counsel.

A crucial issue at trial was whether defendant's acts were murder or involuntary manslaughter. (Tr.T 1588, Tr.T 1618-1619, Tr.T 1659, Tr.T 1688, Tr.T 1690) Some of the

2

Statement of Facts are from the original trial, which Record was reviewed by the post-conviction trial court and implicitly is part of the Record in the post-conviction proceedings. "Tr.T" refers to pages of the transcript of the original trial; "Tr.PC" refers to pages of the transcript of the post-conviction proceedings.

Defense counsel at trial requested an instruction on involuntary manslaughter. An involuntary manslaughter instruction was given. Co-defense counsel, Mr. Johnson, argued to the jury that if defendant was guilty of any offense, it was only involuntary manslaughter. (Tr.T 1659) He supported that argument by reference to testimony as to how defendant loved Travis. He argued:

"Craig Zimmerlein assumed the responsibilities of a special child. The natural father, Follman, Travis's natural father, is not in the picture. Not anywhere to be seen emotionally, particularly financially. Craig Zimmerlein is.

Craig Zimmerlein is his dad and he assumes the responsibilities of this special child. Brings him to and from day care almost on a daily basis. Changes diapers. Takes him roller blading. Plays with him. Baby-sits with him. Does all the things that a father would do. Loves the child. Loves the child. That's the context within which this occurred.

You don't have to take his word for it. Listen to Donnita Zimmerlein. Listen to Mrs. Harwood. Listen to

3

what they tell you. Listen to the happy child definition
we got out of Ms. Elizondo. Remember the day care. This
was a kid who loved life. He was a great..." (Tr.T 1560)

"And as you sit here and you think about that love
that is uncontradicted, no history, no prior broken
bones, no prior history of prior abuse, no nothing, only
a history of love, you ask yourself the question do you
really think that on March 20, 1996 when Craig Zimmerlein
kicked Travis ..., do you really think that he was saying
to himself I want to kill or do great bodily harm to this
child? Do you really think that's what he was doing?

And that's what they have to prove that he was
thinking beyond a reasonable doubt. When he was meeting
out this inappropriate form of punishment, based on the
context that you know of this family of love, was he
thinking I want to kill or do great bodily harm to Travis
Follman? Of course not." (Tr.T 1690)

"And certainly you can't, knowing what you know
about Craig Zimmerlein and his family and what he did and
how he assumed fatherhood, certainly you can't be
thinking for a second that he intended or he knew he
would cause great bodily harm or death. Great bodily harm
or death when he did this." (Tr.T 1705)

The prosecutor refuted defense position by arguing that
the evidence of defendant's love for Travis was not credible
because such testimony was only from persons who were very
close family members of defendant and had strong bias. He

4

argued:

> "Other things that you consider while you adjudicate
> the credibility of witnesses is an interest that that
> witness might have. Any interest that that witness might
> have to maybe color their testimony in a certain fashion.
> Bias really is what it is called. Does the particular
> witness have a bias to color their testimony in a certain
> fashion, to testify in a self-serving kind of a way.
> Consider that, ladies and gentlemen, as it relates to
> witness testimony.
>
> Prejudice. Any prejudice that that witness might
> have, relationships with the defendant, relationships
> with the victim, being a defendant." (Tr.T 1618-1619)

It was argued in the post-conviction proceeding that trial counsel rendered ineffective assistance of counsel when he failed for no strategic reason to present readily available evidence that supported his argument that defendant loved the child, and hence, if guilty, the offense should be involuntary manslaughter. It was argued that the decision of defense counsel was not for a valid strategic reason because he failed to interview readily available witnesses who would strongly support the involuntary manslaughter position.

It was argued in the post-conviction proceedings that counsel rendered ineffective assistance of counsel by not calling available unbiased witnesses or close family members who were essentially neutral witnesses who would testify to defendant's substantial love for the deceased child.

5

It was argued at the post-conviction proceeding that counsel was ineffective because his decision not to call these witnesses was made without speaking to these witnesses who he was aware existed.

It was argued in the post-conviction proceeding that other than defendant, all the witnesses defense counsel referred to at trial to show defendant's love for Travis were State witnesses, defendant's wife, Donnita Zimmerlein (Tr.T 1025-1180), defendant's mother-in-law, Mrs. Harwood (Tr.T 878-949) and Ms. Elizondo (Tr.T 683-694). The testimony of each of those witnesses contained only a short reference to defendant's relationship with Travis.

The witnesses who testified at trial concerning defendant's love for Travis were a teacher, Ms. Elizondo (direct, Tr.T 914-921; cross, Tr.T 922-924); the grandmother of Travis, Mrs. Harwood (direct, Tr.T 1109-1166; cross, Tr.T 1169-1171); the child's mother, Donnita Zimmerlein.

Ms. Elizondo's testimony offered by the defense at trial (Tr.T 922-923) that relates to Craig and Travis was limited to 7 questions as to how they acted together. The testimony was:

> "Q: Craig Zimmerlein is the one that dropped Travis off most of the time, is that fair?
>
> A: Yes.
>
> Q: If fact, he picked him up most of the time; correct?
>
> A: I believe so. I was usually -- I was gone. I usually go in the afternoons.

Q:  And were you present when Craig dropped him off and brought him in the room?

A:  Yes, I was.

Q:  You had an occasion to see Craig bring Travis in and feed him his oatmeal and cookies?

A:  Yes, I did.

Q:  And you saw Craig interact?

A:  Yes, I did.

Q:  You saw him feeding him right there in the room with the other kids?

A:  Well, Craig pretty much brought Travis and his breakfast. Travis came early. We opened at 6:30. He would sit Travis with his meal and then would be off to work.

Q:  After he fed Travis?

A:  He wouldn't feed him. Travis could feed himself.

Q:  He would sit there with him when Travis had milk?

A:  Maybe when he took a drink, but Travis finished by himself. Craig dropped him off and put his food in front of him so he could eat and then Craig would leave." (Tr.T 921-623)

There was limited information provided. There was no opinion provided.

The testimony of Mrs. Harwood was also very minimal (Tr.T 1166, 1169-1171). Of those pages, the information as to Craig loving Travis was limited. It was:

"Q:  And you got to see the relationship between

7

Craig and Donnita?

    A:  Yes, I did.

    Q:  And Craig and Travis?

    A:  Yes.

    Q:  Loving?

    A:  Yes.

    Q:  Caring?

    A:  Yes.

    Q:  The three of them complemented each other in a family way?

    A:  Yes, they did." (Tr.T 1166)

    "Q:  And you talked a little bit yesterday about Craig throwing Travis up in the air?

    A:  Yes.

    Q:  And when Craig did that, Travis would laugh and giggle, wouldn't he?

    A:  Yes." (Tr.T 1170)

As to Donnita Zimmerlein, cross-examination started at Tr.T 1370. On Tr.T 1382, there was one question that related to defendant helping Travis with sign language; on Tr.T 1383, two questions that Craig helped Travis learn to climb stairs; on Tr.T 1385 three questions how defendant helped feed Travis and take him to school from Tr.T 1386 to Tr.T 1399 about Craig playing with Travis and that Craig loved Travis; on Tr.T 1399 that she still believed he loved Travis.

All the questions on those pages were as follows:

    "Q:  And Craig Zimmerlein also helped him with the

sign language, didn't he?

A:  Yes." (Tr.T 1382)

"Q:  Craig was also trying to teach him on the stairs?

A:  Yes.

Q:  In fact, what Craig would do, hold his hand, get him down one or two and then let him try to experiment on his own with Craig right there?

A:  Right." (Tr.T 1383)

"Q:  Craig would take him to school?

A:  Craig would take him to school.

Q:  Craig would bring his breakfast and sit there sometimes with Travis while he would eat?

A:  Yeah, sometimes he would.

Q:  And then he would drop him off?

A:  Pick him up.

Q:  I mean pick him up at school and bring him home?

A:  Yes." (Tr.T 1385)

"Q:  On that first date is when Craig and Travis were playing together; right?

A:  Right.

Q:  You noticed they seemed to hit it off; right?

A:  Yes." (Tr.T 1386)

"Q:  He played with him?

A:  Yes.

Q:  Throw him up in the air?

A:  Catch him, yeah.

9

Q:  Hold it like the Superman, hold as it were like he was flying?

A:  Yes.

Q:  And then you and Craig and Travis got along fairly well about that time?

A:  Yes." (Tr.T 1387)

"Q:  And Craig would take Travis roller blading?

A:  Yeah.

Q:  Put him on a pack on his back and ride him around the neighborhood?

A:  Right." (Tr.T 1388)

"Q:  You got to see the two of them play together?

A:  Right." (Tr.T 1388)

It was argued in the post-conviction petition that this slight testimony as to defendant's love for the child cannot compare in strength and detail to the witnesses the lawyer did not call. Counsel apologizes for listing the below testimony at length. In order to determine whether defendant was denied effective assistance of counsel, this Court must compare what was presented to what was not by seeing the testimony in detail.

Defense counsel had available before trial the names of non-relatives and non-close relatives of defendant as to the defendant's loving relationship with the child. They were: (1) Barbara Jean Voss, non-relative, worked at school where defendant's mother worked; (2) Beverly Delp, non-relative, worked at Somonauk High School; (3) Karol Grandgeorge, school

10

teacher, Somonauk District; (4) Nancy Abens, part of water ski team; (5) George Abens, part of water ski team; (6) Garland E. Spoonmore, non-relative; (7) Della Rohrer, grandmother; (8) Susan Sampson, cousin by marriage; (9) Cary Sampson, cousin.

It was argued at the post-conviction hearing that trial counsel failed to present substantial evidence by these witnesses that strongly demonstrated defendant's love for Travis. These witnesses have testified at the post-conviction hearing to matters that counsel should have presented at trial. Their testimony is as follows:

Barbara Jean Voss (Tr.PC 22) testified in part that she knew the mother of defendant from working at the Somonauk Grade School and she had seen defendant and Travis at a wedding shower and she saw them for at least 3 hours and:

"Q:  What did you observe concerning Craig and Travis?

A:  I thought they were very caring. Travis seemed to think a lot -- Craig carried him into the shower and Travis was hanging onto him affectionately like a three year old will.

Q:  And what was Craig doing with regard to Travis?

A:  He was smiling at him, holding him carefully. They sat next to us at the -- or Travis did but Craig would come and talk to him at this shower." (Tr. 23)

Q:  What type of attitude did Craig show to Travis?

A:  I thought -- you just can tell he looked at him affectionately. Travis I remember patted his face once

11

and just smiled. I don't know other than that.

     Q:  Was there any hostility between --

     A:  No. No, none at all.

     Q:  Was there any affection?

     A:  Yes." (Tr.PC 24)

Beverly Delp saw defendant and Travis at a bridal shower and a racetrack (cars). (Tr.PC 29) She testified as to observation at racetrack in part:

     "Q:  Did you see any interaction between the two?

     A:  Craig was very attentive to Travis to make sure that Travis was fine even though he was sleeping." (Tr.PC 31)

As to at the shower:

     "Q: Okay. What did you observe Craig and Travis doing, if anything?

     A:  Well, they were at the shower. There was lunch and Travis at one point was playing on the floor on a little blanket and Craig was playing with him.

     Q:  On the floor?

     A:  They were enjoying each other, yes.

     Q:  What did -- did Craig do anything after he was playing on the floor with Travis?

     A:  I believe, if I remember right, he was holding him at the time that we left.

     Q:  How was he holding him?

     A:  In his arms.

     Q:  Well, in a rough fashion?

12

A:  <u>In a fatherly fashion, yes. A loving fashion,
yes</u>." (Tr.PC 31-32)

"Q:  What were they doing?

A:  <u>He was very attentive to Travis making sure that
Travis was being taken care of</u>.

Q:  In what way, ma'am?

A:  Well, to make sure that he was getting his
lunch, that he was being fed and things that he wasn't
doing it but he was there." (Tr.PC 32)

"Q:  <u>Did you have an opinion concerning whether
Craig had a loving relationship with Travis</u>?" (Tr.PC 34)

"A:  <u>Yes, I think I do</u>.

By Mr. Cohn:

Q:  <u>What is your opinion</u>?

A:  <u>I believe he loved, Craig loved Travis</u>." (Tr.PC
35)

<u>Susan Sampson</u> (Tr.PC 43), a cousin to defendant by
marriage, testified she observed defendant and Travis at a
Thanksgiving dinner at a restaurant and later that day at a
house. She testified as to at the restaurant:

"Q:  And what did you see or how did you see Craig
relate to Travis?

A:  Well, he was helping him eat and feeding him.

Q:  You say helping him eat. Was he giving him
instructions or was he holding the spoon and knife? Was
he cutting the food? What was he doing?

A:  He was probably feeding him." (Tr.PC 44), and at

13

the house:

"Q:  What did you see -- what did you see Craig doing with Travis?

A:  Playing with him and they were down on the floor and just playing. And I remember our son at that time, they were all down on the floor at that time playing with Travis." (Tr.PC 44-45)

As to the general relationship between defendant and Travis, she testified:

"Q:  Did you feel that you have the ability to determine whether or not an adult and a child are in a loving relationship or not?

A:  Yes.

Q:  When you observed Craig at both the restaurant and the relative's house, did you come to an opinion as to whether there was a loving relationship?

A:  Yes, very much so." (Tr.PC 46)

"Q:  And what can you tell me about the defendant's relationship with Travis?

A:  I felt he was a very loving parent to him.

Q:  And was that based on just surmise or actions that you observed?

A:  Actions I observed.

Q:  What type of actions did you observe?

A:  Just how he played with him and how he took care of him.

Q:  Did he play rough or gentle?

14

A:  No, no. Just played like, you know, you play
with a child." (Tr.PC 48)

<u>Gary Sampson</u>, cousin, testified (Tr.PC 65) saw at
Thanksgiving function at a restaurant and at a house. In part,
he testified:

"Q:  How did Craig treat Travis?

A:  Craig was I would call the primary care-giver
for Travis during the meal and, well, they parked next to
us when we came in. Travis brought him in -- Craig
brought Travis into the restaurant, set him in his chair,
tended to him, monitored him, took care of him.

Q:  <u>Would you say that Craig was more attentive to
Travis than Donita was or was Donita more attentive to
him</u>?

A:  <u>Craig was more attentive</u>.

Q:  <u>Did Craig treat Travis roughly or gently</u>?

A:  <u>Very kindly</u>." (Tr.PC 67-68)

He testified as to what he observed at the house as
follows:

"Q:  What did you observe concerning the interaction
of Craig and Travis?

A:  Travis was the only small child there and Craig
and my two children and Travis were playing together
interacting together on the floor in the living room
area.

Q:  Was that in your view?

A:  Certainly.

15

Q:  Again I will ask you was the actions of Craig rough or gentle towards Travis?

A:  Gentle. They were all playing with him very nicely." (Tr.PC 68)

"Q:  <u>Do you feel that you have sufficient experience to give an opinion concerning whether Craig acted as a loving parent or parent substitute for Travis</u>?

A:  <u>Yes. I could say that he acted very properly</u>.

Q:  So you could come to an opinion?

A:  Yes.

Q:  <u>And what is that opinion</u>?

A:  <u>That he was a very caring, loving parent</u>."

(Tr.PC 69)

<u>Karol Grandgeorge</u>, a prior school teacher (second grade) in Somonauk for 22 years (Tr.PC 80), testified she observed defendant and Travis in a doctor's waiting room. She testified:

"Q:  Why do you believe it was winter?

A:  Because I can remember that Craig helped take Travis's winter clothing off of him.

Q:  How long did you observe Craig and Travis together in that doctor's waiting room?

A:  No more than 15 minutes.

Q:  Now, after Craig took Travis's clothes off -- strike that.

When he took, when Craig took Travis's clothing off, did he do it in a harsh or gentle fashion?

16

A:  Gentle.

Q:  <u>What did Craig do after he got the clothing for Travis -- off Travis? Did he do anything</u>?

A:  <u>He tried to -- well, he took a book, a children's book from the stack and tried to read to him or entertain him in some way</u>.

Q:  Who tried to read to who?

A:  Craig tried to read to Travis.

Q:  And were they sitting next to each other? Was Travis sitting on Craig's lap? What was the inter-personal physical relationship?

A:  Travis was on Craig's lap." (Tr.PC 82-83)

"Q:  <u>Based on your experience as a second grade teacher, would you say that Craig's relationship and how he treated Travis was good or poor</u>?

A:  <u>Good</u>.

Q:  What did you observe -- what else did you observe Craig do in relationship to Travis?

A:  Well, there was one time when Craig told Travis that he wasn't to do something and Travis, of course, didn't like that and um ...

Q:  How did Craig handle that situation?

A:  He tried to divert his attention to something else with keys or a toy or something that he had.

Q:  What that good parenting?

A:  I believe it was, yes.

Q:  In your years, 20 some years as a teacher of

17

second, first grade students, have you seen parents
relate to minor children?

A:  Yes.

Q:  <u>Would you -- do you think you can come to an
opinion as to whether Craig related in a loving or
unloving fashion towards Travis</u>?

A:  <u>Loving, a loving relationship</u>.

Q:  Was there any inappropriate activity of Craig
towards Travis in the doctor's office?

A:  I saw none." (Tr.PC 83-84)

"Q:  <u>So your statement is that during these 15
minutes Travis -- Craig was loving to Travis; is that
right</u>?

A:  <u>That's correct</u>." (Tr.PC 87)

<u>Nancy Abens</u> who knew defendant from their volunteering on
a water ski team (Tr.PC 95) saw defendant and Travis together
five or six times. (Tr.PC 96)

"Q:  Okay. And how did you -- what did you see them doing
together?

A:  Craig would be walking with Travis or holding
Travis and they would be laughing and having fun.

Q:  Okay. When Craig was holding Travis, would he be
holding Travis in a rough or gentle manner?

A:  No. He be holding him in a nice, like cozy
little, just like I would hold my children.

Q:  Would you hold your children gently or roughly?

A:  I would hold them gently." (Tr.PC 96)

18

"Q:  Have you seen adult men with minor children in your lifetime?

A:  Yes.

Q:  How many times? Hundreds, 500, a thousand?

A:  Probably a million.

Q:  You feel you're able to give an opinion as to whether during the times you observed Craig and Travis, Craig acting or not in a loving fashion towards Travis?

A:  Yeah.

Q:  What was that opinion?

A:  I think that Craig, if I hadn't known that Craig wasn't the father of Travis, I would have thought that Craig had fathered Travis and that he was a loving, compassionate, caring father." (Tr.PC 97)

George Robert Abens (Tr.PC 110) also was part of the volunteer ski team testified:

"Q:  On a number of occasions you saw Craig there with Travis?

A:  Yes.

Q:  When you saw Craig there with Travis, would you explain how you saw them interact? Let me ask you this. Was Craig gentle or rough with Travis?

A:  He was gentle, very gentle.

Q:  What had you seen him do with Travis in a gentle fashion?

A:  He would pick him up and carry him down our lane or wherever.

19

Q:  Do you have any children?

A:  Yes. Three.

Q:  Have you seen other adult men relate to minor children in your lifetime?

A:  Yes.

Q:  <u>Do you think you have the ability to say whether Travis -- excuse me, Craig treated Travis or not with love and affection</u>?

A:  <u>Yes</u>.

Q:  Do you think you -- what is your opinion?

A:  He did treat him that way. Like I said, whenever he needed to be picked up, he would pick him up and carry him to different places or just console him." (Tr.PC 111-112)

"A:  When I saw Craig and Travis together it was at a practice. I don't really recall at a regular show. It was just when we were down there practicing. We practiced.

Q:  How many times did you see Craig and Travis together total?

A:  I would say four or five.

Q:  Four or five.  And it's your testimony that it was at these practices?

A:  Correct." (Tr.PC 116)

<u>Garland E. Spoonmore</u> testified (Tr.PC 122) he knew defendant for eleven to twelve years from the car racetrack (Tr.PC 123); saw Craig and Travis together a couple of times.

20

He testified in part:

> "Q: How did you -- what did you see them do? Was
> Craig carrying Travis, were they playing, what was going
> on?
>
> A: Well, they were -- they had him in a little
> napback-thing they carried him in. Seemed like they were
> having a good time.
>
> Q: Okay. Did you ever see Travis outside of that
> pack?
>
> A: No.
>
> Q: How did Craig treat Travis? Was it in a rough or
> gentle fashion?
>
> A: Very gentle, very loving." (Tr.PC 123-124)
>
> "Q: You already said that Craig treated Travis in a
> loving fashion. Based on your experience with parents and
> children over your lifetime, do you feel you are capable
> of coming to an opinion concerning whether a parent or
> substitute parent is acting in a loving fashion?
>
> A: I think so, yes.
>
> Q: And what was your opinion concerning Craig
> towards Travis?
>
> A: He was a very loving type father is the way I
> would have to put it." (Tr.PC 124-125)

Della Rohrer, defendant's grandmother, testified (Tr.PC
139) in part:

> "Q: Did you ever see Craig and Travis together?
>
> A: Oh, yeah.

21

Q:  Approximately how many times?

A:  Oh, four or five.

Q:  Okay. Would you tell me where you had seen them together?

A:  Well, one time it was up at the racetrack. It was -- he was watching the races and he came up with Travis. He had a backpack on his back and carrying him.

Q:  Okay.

A:  They came up. It happened to be my birthday and they came up with a birthday present for me.

Q:  And how did Craig treat Travis? Was it rough or gentle?

A:  No. He was real good with him. He has got a lot of patience with him and he was always smiling and always with him." (Tr.PC 140-141)

She saw them again at Thanksgiving. She testified:

"Q:  For how long did you see them together?

A:  Oh, they stayed several hours.

Q:  Okay. And what did you see Craig do with Travis?

A:  Well, he played with him and paid a lot of attention to him. Of course Travis liked that.

Q:  Okay. Was Craig gentle or rough with Travis?

A:  No, he wasn't rough with Travis. He was very kind. He was always taking care of -- made sure he had plenty to eat and plenty. He was good with him." (Tr.PC 141-142)

She also saw them on Christmas. She testified:

22

"Q:  What about on Christmas?

A:  Christmas they came. We had Christmas dinner together and Travis was there and Craig.

Q:  And how did Craig treat Travis?

A:  Oh, he was very patient with him and very kind to him. Travis always looked up to being with him.

Q:  Did Craig do anything concerning the special education needs of Travis?

A:  I didn't catch that.

Q:  Did Craig ever do anything about the special education needs?

A:  Yes, he did.

Q:  What did he do?

A:  Well, he talked it over with his mother, which is Linda Zimmerlein, and wanted her to help him find a school for him to get into.

Q:  For Travis to go to?

A:  Yes.

Q:  To get special education?

A:  Yes. It was sign language.

Q:  Did Craig get Travis enrolled in a special school?

A:  Yes, he did." (Tr.PC 142)

"Q:  Fine. Do you think you have the ability to give an opinion of whether Craig had a loving relationship with Travis?

A:  Yes, I think I could.

23

Q:  <u>What is your opinion about Craig loving Travis</u>?

A:  <u>Well, he loved him as well as it would have been</u>

<u>his child. He really wanted to adopt him and he was</u>

<u>always interested in being with Travis</u>." (Tr.PC 143)

The State called Attorney David Camic, trial counsel, to testify. He felt, in his professional opinion, that his best defense witness was Donita Zimmerlein, the mother of the child and the wife of defendant and that defendant's love for the child was brought out in the testimony of the mother. He also called the grandmother of the child and a teacher of the child for a few questions. In Attorney Camic's professional opinion, the mother's testimony was "the Gold Standard" defense theory.

<u>Argument</u>

1.

The decisions in the State courts misapplied the United States Supreme Court decisions in <u>Strickland v. Washington</u>, 466 U.S. 668, 80 L.Ed.2d 674 and <u>Ornelas v. United States</u>, 517 U.S. 609, 134 L.Ed.2d 911.

> Defendant was denied effective assistance of counsel where counsel failed to present available witnesses whose testimony would have raised reasonable doubt as to whether defendant was guilty of murder and which would have caused the jury only to find defendant guilty only of involuntary manslaughter; that counsel's decision not to call these witnesses was ineffective assistance.

A crucial issue at trial was whether defendant was guilty of murder or involuntary manslaughter. Defense counsel requested and had the jury instructed on the lesser included offense of manslaughter. (Tr.T 1588)

Trial defense counsel argued to the jury that if defendant was guilty of any offense, it was only involuntary

24

manslaughter. (Tr.T 1585)

Counsel failed to present the substantial evidence as to defendant's love for Travis that could have been presented by witnesses. Witnesses have testified at the post-conviction hearing to matters that counsel should have presented at trial. Their testimony is set out in the Statement of Facts.

Having chosen to proceed with the involuntary defense based on defendant's loving relationship with Travis, it was ineffective assistance not to present the above non-related witnesses.

The failure of a counsel to present "no motive evidence" or alibi evidence, People v. Butcher, 240 Ill.App.3d 507, 608 N.E.2d 496, or other evidence that provides corroboration for defendant's defense is ineffective assistance of counsel. See People v. Thompkins, 191 Ill.2d 438, 732 N.E.2d 553, 247 Ill.Dec. 498. See also Hall v. Washington, 106 F.3d 742; Jackson v. Herring, 42 F.2d 1350; Workman v. Tate, 957 F.2d 1339 (6 Cir. 1992); People v. Howery, 178 Ill.2d 1, 687 N.E.2d 836 (1997); People v. Butcher, 240 Ill.App.3d 507, 608 N.E.2d 496 (1 Dist. 1992); People v. Tillman, 226 Ill.App.3d 1, 589 N.E.2d 587 (1 Dist. 1991).

Evidence that defendant loved the child and acted as a good father would clearly be admissible under the same theory pursuant to which, evidence of lack of love and acting as a bad father, has been held admissible in this type of case. People v. Lucas, 132 Ill.2d 399, 548 N.E.2d 1003, 1013-15, 139 Ill.Dec. 447, 456-59 (1989).

25

Evidence of defendant's love for child victim is relevant, especially where the issue is whether the acts were murder or involuntary manslaughter. The mental state between the two offenses is very similar. Courts have said that the mental state between the two offenses is a very thin line. Lucas, supra; People v. Carlton, 26 Ill.App.3d 995, 326 N.E.2d 100, 103 (1 Dist. 1975); People v. Farmer, 50 Ill.App.3d 111, 116, 365 N.E.2d 177, 180, 7 Ill.Dec. 892, 895 (5 Dist. 1977), quoting People v. Bolden, 103 Ill.App.2d 377, 243 N.E.2d 687, 689 (1 Dist. 1968).

On the issue that prior treatment of the child by the defendant is relevant to defendant's state of mind, vis-a-vis whether the offense was murder or involuntary manslaughter, see People v. West, 137 Ill.2d 558, 560 N.E.2d 594, 607, 148 Ill.Dec. 196, 209 (1990); People v. Rodriquez, 275 Ill.App.3d 274, 655 N.E.2d 1022, 1029-30, 211 Ill.Dec. 639, 646-47 (1 Dist. 1995); see also Alvarez v. McGinnis, 4 F.3d 531 (7 Cir. 1993) (denying habeas corpus relief; simultaneous consideration by jury of murder and involuntary manslaughter proper; no due process violation).

Many of those witnesses not called were not family members, but people who had just seen defendant interact with Travis. These types of witnesses (independent witnesses) have special force in convincing jurors of the correctness of a defendant's position. See United States v. Hampton, 347 F.3d 219, where the court stated:

"'[h]aving independent witnesses corroborate a

defendant's story may be essential'); *United States ex rel. Cosey v. Wolff*, 727 F.2d 656, 658 n. 3 (7th Cir. 1984)."

See also <u>Montgomery v. Patterson</u>, 846 F.2d 407; <u>Crisp v. Duckworth</u>, 743 F.2d 580.

The failure of counsel to call these witnesses was ineffective assistance.

The Appellate Court found defense counsel's failure to call other witnesses to testify as to defendant's love of Travis was not ineffective because the witnesses he called were of the same nature of the witnesses he did not call. The error of the Appellate Court is twofold. First, the witnesses not called were much stronger witnesses for the defense than the witnesses that were called by the defense. This can be observed by comparing testimony called at trial and that called at the post-conviction.

Second, the opinion of the attorney must be given little weight because he never spoke to the potential defense witnesses and therefore had no rational basis to make a decision.

The failure to investigate cannot be excused as trial strategy. In <u>Crisp v. Duckworth</u>, 743 F.2d 580, the court stated:

"Though there may be instances when the decision not to contact a potential defense witness is justified, ... an attorney who fails even to interview a readily available witness whose noncumulative testimony may potentially aid

the defense should not be allowed automatically to defend his omission simply by raising the shield of 'trial strategy and tactics,'...; *see also Davis v. Alabama*, 596 F.2d at 1217 ('An attorney does not provide effective assistance if he fails to investigate sources of evidence which may be helpful to the defense.'); *United States v. DeCoster*, 487 F.2d at 1201 (A court should not 'second guess strategic and tactical choices made by trial counsel. However, when counsel's choices are uninformed ..., a defendant is denied the effective assistance of counsel.') (footnotes omitted)."

See also <u>People v. Butcher</u>, 240 Ill.App.3d 507, 608 N.E.2d 496.

Review of the testimony presented--mother and grandmother--are subject to attack based on close family relationships; this is not true as to other witnesses. Although there is some family relationship as to the other witnesses, it is not as close and extensive as the mother and grandmother.

Furthermore, the uncalled witnesses' testimony provides more details as a basis for supporting the proposition that defendant's love for Travis would cause defendant's acts to be reckless acts, and hence, defendant should be guilty of involuntary manslaughter and not murder.

Another defect in the Appellate Court's Order is that it never stated the standard which it was using to evaluate trial court ruling. The reviewing court had to properly apply the <u>de</u>

28

novo standard instead of some other standard.

Habeas corpus should be granted by this Court to set the proper standard and to determine whether defendant was denied effective assistance of counsel.

2.

The State courts misapplied the decision of the United States Supreme Court in Ornelas v. United States, 517 U.S. 609, 134 L.Ed.2d 911.

> Defendant was denied due process when the Appellate Court on defendant's direct appeal applied a wrong standard for review, i.e., manifest weight of the evidence instead of de novo.

The Appellate Court erroneously held that the "manifest erroneous" standard is applicable to determine whether defendant was in custody when he made a statement.

Defendant proceeded with a motion to suppress statement asserting he was "in custody" when interrogated at the hospital, and since no Miranda warnings were given prior to that interrogation, any statements should have been suppressed.

On direct appeal, defendant asserted that under People v. Braggs, 209 Ill.2d 492, 810 N.E.2d 472, People v. Foskey, 136 Ill.2d 66, 554 N.E.2d 192, and Ornelas v. United States, 517 U.S. 609, 134 L.Ed.2d 911, the standard of review is de novo. The Appellate Court disagreed. The Appellate Court stated:

> "We note that defendant maintains that the appropriate standard of review in this instance is de novo. We do not agree. Therefore, the proper standard of review was whether the trial court's determination of the

29

'in custody' question was against the manifest weight of the evidence." (Order of Affirmance, p. 19)

With great respect, the Appellate Court applied a wrong standard. The correct standard required the court to decide whether upon <u>de novo</u> review, defendant was "in custody." <u>People v. Braggs</u>, <u>supra</u>; <u>People v. Foskey</u>, <u>supra</u>; <u>Ornelas v. United States</u>, <u>supra</u>.

When the issue of the correct standard was raised in the post-conviction proceedings, the Appellate Court again held that the manifest weight standard applied. (Order of Affirmance, pp. 21-24)

That is an erroneous standard. <u>People v. Braggs</u>, 209 Ill.2d 492, 810 N.E.2d 472, <u>People v. Foskey</u>, 136 Ill.2d 66, 554 N.E.2d 192, and <u>Ornelas v. United States</u>, 517 U.S. 609, 134 L.Ed.2d 911.

Habeas corpus should be granted to state the correct standard.

<strong>CONCLUSION</strong>

For any and all of the foregoing reasons, the petition for a writ of habeas corpus should be allowed.

Respectfully submitted,

s/ Frederick F. Cohn
FREDERICK F. COHN
Bar Number: 0478954
Attorney for Petitioner
35 E. Wacker Drive
Suite 1525
Chicago, Illinois  60601
312-641-0692
fredcohn@ffcohn.xohost.com