IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CRAIG ZIMMERLEIN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 08 C 2595 |
| | ) | |
| NEDRA CHANDLER, Warden, | ) | The Honorable |
| | ) | George W. Lindberg, |
| Respondent. | ) | Judge Presiding. |

## <u>ANSWER</u>

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts and this Court's May 13, 2008 order, respondent NEDRA CHANDLER answers the instant petition for writ of habeas corpus as follows:

1.    Petitioner Craig Zimmerlein is incarcerated at the Dixon Correctional Center in Dixon, Illinois, where he is identified as prisoner number K68216. Petitioner is in the custody of Nedra Chandler, that facility's warden.

2.    In 1997, petitioner was tried before a Kane County, Illinois jury for the murder of his stepson Travis, a nonverbal toddler with Down's Syndrome.  The Illinois Appellate Court summarized the evidence introduced at petitioner's trial:

> Donnita Zimmerlein, [petitioner's] wife and Travis's mother, testified as follows.  Travis was born on February 20, 1993, and was diagnosed with Down's Syndrome and a heart defect.  He went though heart surgery when he was six months old. . . . Travis was developmentally delayed and smaller in size than other children his age.

Donnita . . . began dating [petitioner] at the beginning of August 1995. A few weeks later, [petitioner] moved in with Donnita and Travis, who shared a home with Donnita's mother. Donnita and [petitioner] married in January 1996. Donnita told [petitioner] about Travis's condition but had told him to treat Travis like a regular child. . . . Travis could not talk but had begun learning sign language.

On March 20, 1996, at about 5:30 p.m., Travis ate most of a can of Spaghettios. At about 7 p.m., Donnita went shopping with her friend Tina Glover. They left Travis and Tina's 1½-year-old daughter, Kristen, with [petitioner]. At about 8:45 p.m., Donnita received a page and called home. [Petitioner] said that he had hit Travis and put him to bed, and that she should come home and "see the damage." She rushed home . . . [and] asked [petitioner] what had happened. He said that he had hit Travis and that Travis had fallen down the stairs. Donnita went upstairs and saw that Travis was pale and unresponsive and that his stomach was distended. Donnita had taken a class in emergency medicine as part of her training to be a certified nursing assistant, and she thought that Travis was in shock and needed medical attention. Donnita and [petitioner] drove Travis to the hospital because Donnita thought they could get there faster than an ambulance could.

Donnita testified that she still believed that [petitioner] loved Travis. She brought Travis on her first date with [petitioner], and they played together and appeared to hit it off. [Petitioner] would throw Travis in the air and hold him like he was flying. He would take Travis to school and sometimes sit with him while he ate his breakfast there. [Petitioner] would also pick him up from school and bring him home. He helped Travis learn sign language and was trying to teach him to go down the stairs. [Petitioner] babysat on several occasions, even when there were other kids present. He would also put Travis in a back carrier and roller-blade with him around the neighborhood. Travis never showed any fear of [petitioner], and Donnita never saw any unexplained cuts or bruises on him. [Petitioner] acted like a regular dad and fed and changed Travis.

When [petitioner] mentioned seeing the "damage" he had done, Donnita thought that Travis had gotten into the curio cabinet or her wedding dress; she did not think that [petitioner] had hurt Travis. [Petitioner] had once hit Travis when he climbed out of his car seat, resulting in a fat lip. Donnita told [petitioner] to spank Travis only on the butt.

2

Kathleen Harwood, Travis's [maternal] grandmother, testified that . . . . [t]he relationship between [petitioner] and Travis was loving and caring. [Petitioner] would hold Travis in the air as if he was flying, and Travis would smile and laugh. She never saw any problems between them, and she never saw [petitioner] strike Travis. [Petitioner] babysat Travis, sometimes with another child, both before and after he and Donnita got married. Kathleen never noticed any injuries or unexplained bruises on Travis after [petitioner] baby-sat him. She also never saw [petitioner] lash out in anger at Travis, Donnita, or herself. Kathleen did not think that [petitioner] had intentionally hurt Travis, and she still supported [petitioner].

Mari Elizondo testified that she taught two-year-old children at Learning Letters in Batavia. Travis attended that daycare from October through December 1995. . . . [Petitioner] usually dropped Travis off and would put his breakfast in front of him so he could eat. [Petitioner] would also pick Travis up. Mari never observed any signs of abuse on Travis.

Mike Anderson testified that he was a captain with the Kane County Sheriff's Department. On March 20, 1996, he was a detective sergeant with the department. Some time after midnight that evening, he received a call . . . regarding a possible victim of child abuse. Captain Anderson met with . . . . [petitioner] in a small waiting room next to the emergency room. He told [petitioner] that there were inconsistencies between Travis's injuries and [petitioner's] explanation of them. He asked if [petitioner] struck Travis. [Petitioner] replied that he kicked Travis in the stomach and then kicked him again in the stomach after Travis fell. Captain Anderson asked why he kicked Travis, and [petitioner] explained that Travis was in his bedroom, which he had been told to stay out of. Afterwards, Travis was crying and they went to the stairs. Travis then fell down the stairs and cut his lip. [Petitioner] changed Travis's clothes, put him to bed, and gave him a sipper cup. Travis started vomiting in bed and had some blood coming out of his mouth. [Petitioner] tried to clean him up with tissues and a washcloth. He checked on Travis periodically and became concerned because Travis's belly was swelling and his hands were cold. [Petitioner] then paged Donnita and asked her to come home. They decided to drive Travis to the hospital because they thought they could get there faster than by waiting for an ambulance.

\*   \*   \*

3

[Petitioner] testified that he got along with Travis from the first day he met him. Donnita told [petitioner] that Travis had Down's Syndrome but should be treated like a normal child. Travis had a scar from a heart surgery but Donnita said that his heart was fine now. [Petitioner] knew that Travis was mildly retarded and a little behind on development. [Petitioner] played with Travis by reading to him, tossing him in the air, holding him like Superman, swinging him between his arms, and roller blading with him in a back carrier. He had taken Travis on short excursions by himself as well. [Petitioner] went to some of Travis's doctor visits and helped take care of Travis by feeding him, bathing him, changing him, and taking him to and from daycare. He previously babysat Travis on many occasions and had babysat Kristen and Travis together before as well. [Petitioner] had been planning to adopt Travis.

[Petitioner] further testified that on March 20, 1996, Donnita and Tina went to the mall at about 7 p.m. At about 7:30, [petitioner] was watching television when he heard Travis and Kristen upstairs. He yelled at them to get out of the bedroom he shared with Donnita. [Petitioner] had told Travis on prior occasions not to go in that room, and [petitioner] was frustrated. [Petitioner] took the children to the top of the stairs and they scooted down on their butts. [Petitioner] did not think to block off the stairs . . . .

The children began playing on the first floor and [petitioner] went back to watching television. At about 8 p.m., [petitioner] heard the children upstairs again. He felt frustrated and agitated. [Petitioner] grabbed a laundry basket and went upstairs. Kristen left the bedroom and started going down the stairs. Travis was still in the bedroom, and [petitioner] lost his temper and kicked him in the stomach. Travis fell to the floor and cried, and [petitioner] kicked him in the stomach a second time. He did not think that he kicked Travis hard enough to hurt him. [Petitioner] had kicked him to punish him, like a spanking, but did not spank him because he was holding the laundry basket.

Travis started crying, and [petitioner] took his hand and walked him to the top of the stairs. [Petitioner] help[ed] him to the first step, and Travis sat down. Travis then began scooting down the stairs and then fell and tumbled to the bottom. [Petitioner] ran down and picked him up. Travis was crying and had bitten his tongue, and so his lip was also bleeding. [Petitioner] carried him upstairs and wiped the blood with some tissues. It was around Travis's bedtime, so

[petitioner] changed him into his pajamas.  He held and comforted Travis until Travis stopped crying.  [Petitioner] put Travis to bed and gave him his sipper cup, and Travis seemed to drink from it.  Travis did not vomit at this point or at any other point that evening.

Kristen was crying downstairs, so [petitioner] went to check on her.  She calmed down, and he ran upstairs to check on Travis.  He then went back and forth between Kristen and Travis again.  [Petitioner] then paged Donnita because Kristen would not stop crying and he was worried about Travis.  Travis was not falling asleep quickly like he usually did, and [petitioner] was concerned about Travis's fall and facial injuries.  When Donnita called, [petitioner] told her that Kristen was crying and that she should come home and see the damage right away. [Petitioner] was referring to Travis's fall. When Donnita arrived home, he told her that Travis had fallen down the stairs.  He did not tell her that he had kicked Travis because he though that Travis's injuries were from falling down the stairs. [Petitioner] also knew that he should not have kicked Travis and did not want Donnita to know that he had.  When Donnita saw Travis, she started crying and said that they had to get to a hospital immediately. [Petitioner] did not tell anyone that he had kicked Travis until he was asked by the police to tell them what happened so that the hospital could better treat Travis's injuries.

[Petitioner] further testified that he was a member of an amateur water ski team where he performed tricks, such as barefoot skiing, pyramids, and jumping.  He lifted weights about four times a week and also roller bladed.  He admitted that in March 1996, he was a fairly muscular person.

Dr. Narha Lee testified that she is a general surgeon at several hospitals, including Delnor Hospital in St. Charles.  On March 20, 1996, she arrived at the hospital at 10:40 p.m. in response to a call about Travis.  Children that suffer trauma are usually crying and moving around, but Travis was very quiet, looking into space, and moving occasionally.  His blood pressure was very low, indicating shock, and his abdomen was distended.  He grimaced in response to pressure on his abdomen.  The staff had been told that he had fallen down stairs, so Dr. Lee checked his spine and ordered a chest x-ray. She also ordered abdominal x-rays based on this physical examination. The x-rays appeared o.k., and Dr. Lee then ordered a CT scan.  The scan indicated a rupture in the abdomen, and exploratory surgery of the abdominal cavity revealed a six to seven-centimeter tear in front of

the stomach. It was "[j]ust blown out," and there were a lot of what appeared to be Spaghettios all over the abdomen. Travis also had a small tear on his spleen. After Dr. Lee sewed up the stomach tear and cleaned and sewed the abdomen, Travis's condition stabilized. She arranged to transfer Travis to Children's Memorial Hospital.

Dr. Lee opined that Travis's injury was caused by a "great deal of force" and that it was consistent with being kicked twice in the stomach by an adult. She further opined that it could not have been caused by falling down the stairs. The injury would have caused Travis a tremendous amount of pain, and he would have cried until he exhausted himself. Dr. Lee also agreed that the more bloated the stomach, such as from eating a full dinner, the more easily it will perforate.

Robert Arensman, the surgeon-in-chief at Children's Memorial Hospital, provided the following testimony. Travis arrived at Children's Memorial on March 21, 1996, at about 1:15 a.m. He was critically ill but borderline stable and was suffering from uncontrolled internal bleeding. The bleeding did not stop, so Dr. Arensman performed another surgery. Travis had a stomach laceration, a swollen bowel, and a bruised pancreas. Dr. Arensman repaired the stomach with a different type of suture to control the bleeding. Although most of the bleeding stopped, Travis's condition did not improve because his lungs began to fill with fluid. Travis died on March 23, 1996. Dr. Arensman opined that Travis was a victim of child abuse and that the injury to the stomach was caused by a "very forceful blow to the abdomen." The blow had to have been "tremendous" because the stomach has an extra muscle coat and does not perforate easily. The injury was not consistent with falling down the stairs. Dr. Arensman agreed that a stomach full of food would make it more vulnerable to a rupture as a result of trauma.

(Exh. N at 2-9). At petitioner's request, the trial court also instructed the jury on involuntary manslaughter. (*Id.* at 9). The jury convicted petitioner of murder. (*Id.* at 1).

3.    At the September 1998 sentencing hearing, the State offered evidence of petitioner's aggressive tendencies through the testimony of two jail officers and two

of petitioner's acquaintances.  The jail officers, Jason Ramey and Dyana Maggiore, described instances in which petitioner was belligerent, refused to follow orders, spit on a fellow inmate, and attempted to intimidate a jail officer during petitioner's pre- and post-trial custody.  (Exh. A at 1802-17, 1851-56).  Petitioner's former live-in girlfriend, Jolene Spain, testified that petitioner had a violent temper and would "scream, yell, swear, [and] throw things."  Spain testified that petitioner had thrown objects at her, including car keys and an ashtray, had participated in a bar fight, and had put his hand through a glass table.  Spain further testified that she had seen petitioner "lose his temper" with his Samoyed puppy and kick the 25- to 30-pound dog "across the room."  Spain also described an incident in which petitioner grabbed her neck, kicked her while wearing construction boots, knocking her to the ground, and then "kick[ed her] a couple more times" as she laid on the ground, causing her to suffer bruising on her neck and bruised and sprained ribs. (*Id.* at 1859-74).  Finally, Michael Gradert testified that petitioner repeatedly threatened to kill him after Gradert accidentally wrecked petitioner's boat.  Soon after petitioner made those threats, petitioner and two friends entered Gradert's apartment uninvited and ripped the phone from the wall to prevent Gradert's girlfriend from contacting the police.  Petitioner then pushed Gradert to the ground and "beat the shit out of" him while his two friends "stood there like a couple of bodyguards."  During the beating, petitioner placed Gradert in a headlock and rammed his head into a refrigerator.  (*Id.* at 1899-1920).

7

Petitioner presented character witnesses, including George Abens and Beverly Briggs-Delp, both of whom expressed doubt that petitioner had actually murdered Travis. Abens testified that he "c[ould]n't believe" that petitioner murdered Travis, but he conceded that petitioner never told him what happened on the night Travis died and that he did "not know all the facts." (*Id.* at 2055-59). Briggs-Delp refused to accept that petitioner kicked Travis intentionally, speculating that he must have "slipped" or "tripped," and she even expressed doubt about whether petitioner kicked Travis at all. Finally, Briggs-Delp testified that she would not consider petitioner a "menace to society" even if he had kicked Travis intentionally. (*Id.* at 2065-71).

After hearing all of this evidence, the court sentenced petitioner to 40 years of imprisonment. (*Id.* at 2126).

4.    Petitioner appealed, and the Illinois Appellate Court affirmed. In its opinion, the court observed that petitioner's conviction for murder, rather than involuntary manslaughter, was "entirely warranted" because "[petitioner] knew when he kicked Travis twice that his actions created a strong probability of death or great bodily harm." (Exh. E at 27-28). The Illinois Supreme Court denied petitioner leave to appeal in October 2000 (Exh. G), and petitioner did not file a petition for writ of certiorari.

5.    In December 2000, petitioner filed a state postconviction petition arguing that his trial counsel was ineffective for "failing to present witnesses who would have testified as to the love [petitioner] showed for Travis." (Exh. N at 1, 10).

8

At the 2005 evidentiary hearing, petitioner offered as exhibits documents sent to defense counsel in March 1997 by a mitigation specialist counsel had hired to interview character witnesses prior to petitioner's trial. The documents included detailed summaries of the mitigation specialist's interviews with George Abens, Nancy Abens, and Briggs-Delp, as well as a list of more than 100 additional character witnesses, including Barbara Voss, Garland Spoonmore, and Karol Grandgeorge. (Exh. I). Petitioner called these six witnesses to testify at the evidentiary hearing. All six witnesses testified that they had observed petitioner treat Travis in a non-abusive manner and had concluded, based on the non-abusive treatment, that petitioner had affection for Travis. None of the witnesses explained how they knew how petitioner felt about Travis or specified what testimony — if any — they would have provided had they been called at petitioner's 1997 trial. Much of their testimony was uninformed and incredible: Spoonmore professed ignorance of the events surrounding Travis's death and the evidence introduced at trial; George Abens again expressed disbelief that petitioner kicked Travis; and Grandgeorge maintained that petitioner was a "loving parent" despite having kicked Travis repeatedly. (Exh. H at 93, 119-21, 131).

The State offered testimony from one of petitioner's two trial attorneys. Counsel testified that he reviewed the mitigation specialist's summaries prior to trial, but did not personally interview these six character witnesses. Counsel explained that, in his experience, the best defense witness in a child abuse case is the child's mother or other immediate family member. Here, counsel testified, the

best defense witnesses were Travis's mother, Donnita, and Travis's maternal grandmother, Kathleen, both of whom were "totally on board with the defense." Counsel explained that he made a tactical decision to bring out evidence of petitioner's "obvious affection" for Travis through Donnita and Kathleen — both of whom testified as the State's "life and death witnesses" — instead of "drag[ging] in a bunch of . . . lesser witnesses who had more limited contact" with petitioner and Travis, which counsel thought "might diminish the effect of using the [S]tate's [own] witnesses to show the good affection that [petitioner] had for [Travis]." Counsel added that although a defendant's relatives generally are susceptible to impeachment based on bias, such impeachment was unlikely where the relatives were also State witnesses. (*Id.* at 99-115).

6. In October 2005, the trial court denied postconviction relief. In its opinion, the court noted that defense counsel elicited testimony suggesting petitioner's affection for Travis from Donnita, Travis's mother, and determined that counsel's decision not to call "every person who ever saw" petitioner with Travis was "sound trial strategy" and not "outside the wide range of professionally competent assistance." (Exh. J at 1531, 1533-34). The court further concluded that counsel's determination that introducing testimony from a series of witnesses who saw petitioner with Travis "only once for a short time" would "dilute[]" the value of Donnita's testimony was "reasonable profession[al] judgment." (*Id.* at 1534). Finally, the court determined that counsel's representation of petitioner was "exemplary" and that — even assuming counsel's decision not to call additional

10

witnesses constituted deficient performance — that decision did not prejudice

petitioner.  (*Id.* at 1535).

    7.    Petitioner appealed, and the appellate court affirmed:

        [Petitioner] has fallen far short of overcoming the presumption
    that his trial counsel's decision to rely on the testimony of Donnita and
    Kathleen to show [petitioner's] love for Travis was the result of sound
    trial strategy. [Counsel] testified that before trial, he met with
    [petitioner's] mother, grandmother, wife, wife's friend, and many
    family and friends.  He also hired [a mitigation specialist] to interview
    potential witnesses. [The mitigation specialist] spoke to [petitioner]
    about possible witnesses and then asked each potential witness for
    names of other possible witnesses.  She provided [counsel] with a
    summary of these individuals' statements, including any information
    that they had conveyed about [petitioner's] relationship with Travis.
    Thus, [counsel] was clearly aware that other people could have
    testified regarding [petitioner's] interactions with Travis.  However, he
    testified that he did not think that any of these witnesses could come
    close to the "gold standard" of having [Travis's] immediate family
    testify about [petitioner's] affection for [Travis], and that to the
    contrary, the testimony of additional witnesses could dilute the
    testimony of the "gold standard" witnesses.

    Donnita and Kathleen were also witnesses for the State, which
    arguably gave their positive testimony about [petitioner's] relationship
    with Travis added weight.  Furthermore, although [petitioner]
    characterizes his witnesses at the evidentiary hearing as "neutral"
    witnesses . . .  the record is contrary to his assertion. . . . The
    [following] witnesses were . . . arguably not neutral.  Barbara Voss,
    Beverly [Briggs-]Delp, and Karol Grandgeorge all worked in Somonauk
    schools and knew [petitioner's] mother, a school secretary.  Garland
    Spoonmore was a friend of [petitioner's] brother and his mother-in-law
    was a friend of [petitioner's] mother.  Nancy and George Abens were on
    [petitioner's] ski team . . . .

        Additionally, other than [petitioner's] mother, the witnesses'
    observations of [petitioner] and Travis were limited to, at most, six
    occasions each, and always took place in public or around a number of
    people.  Karol Grandgeorge had observed them together for a mere 15
    minutes.  In contrast, Donnita and Kathleen lived with [petitioner]
    and Travis.  Contrary to [petitioner's] assertion that trial counsel only

11

elicited short references to his relationship with Travis, Kathleen testified that [petitioner] would hold Travis in the air and babysit him, and Donnita testified that [petitioner] would play with Travis, throw him in the air and hold him like he was flying, take Travis to school and sometimes sit with him while he ate breakfast there, and pick Travis up from school.  Donnita also testified that [petitioner] helped Travis with sign language, was teaching him to go down the stairs, babysat him, roller-bladed with Travis in a back carrier, and fed and changed Travis.  Donnita and Kathleen were the two people closest to Travis and presumably the two people most devastated by his death, yet they still testified that [petitioner] loved Travis.  Trial counsel's decision to rely on their testimony to show [petitioner's] love for Travis, rather than presenting a series of more peripheral witnesses who could arguably dilute the impact of their testimony, was a legitimate trial strategy. [Petitioner] has not shown that his trial counsel's performance was deficient, the first prong of the *Strickland* test.  Thus, [petitioner's] ineffective assistance of counsel claim fails.

(Exh. N at 19-21).  The Illinois Supreme Court denied leave to appeal in January 2008.  (Exh. P).

4.     In May 2008, petitioner filed the instant habeas corpus petition arguing that:  trial counsel performed deficiently in failing to call George Abens, Nancy Abens, Barbara Voss, Beverly Briggs-Delp, Garland Spoonmore, and Karol Grandgeorge at trial; there was a reasonable probability that the jury would have acquitted petitioner of murder had counsel called these six witnesses; and the state courts unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), in rejecting this claim.[1]  The petition quotes portions of these six witnesses'

---

[1]  Although petitioner describes the postconviction hearing testimony of three of his relatives — Della Rohrer, and Cary and Susan Sampson —  in the "Statement of Facts" section of his petition, petitioner limits his ineffective assistance claim to trial counsel's failure to call "non-related" character witnesses.  (Pet. 25 ("[I]t was ineffective assistance not to present the above *non-related* witnesses.") (emphasis added)).  Petitioner's second argument — that the state court applied the wrong

postconviction hearing testimony describing their observations of petitioner's treatment of Travis on specific occasions and their opinions regarding petitioner's feelings toward Travis:

### Petitioner's treatment of Travis on specific occasions:

- during petitioner's three-hour wedding shower, petitioner held, carried, talked to, played with, smiled at, and paid attention to Travis; (Voss, Briggs-Delp) (Pet. 11-12);

- on one occasion at a speedway, petitioner paid attention to Travis, who was sleeping (Briggs-Delp) (Pet. 12);

- at several waterskiing team practices, petitioner walked with, laughed with, and consoled Travis, held him in a "cozy" and "nice" manner, and treated him "gentl[y]" and not "rough[ly]" (Nancy Abens, George Abens) (Pet. 18-20);

- on "a couple" of occasions at a speedway, petitioner carried Travis in a backpack and treated him "gentl[y]" (Spoonmore) (Pet. 20-21);

- once, in a doctor's office waiting room, petitioner removed Travis's winter clothing, held him on his lap, read to him, entertained him, re-directed him when he misbehaved, and generally treated him "good" (Grandgeorge) (Pet. 16-17).

### Petitioner's feelings toward Travis:

- petitioner was "caring," "affectionate[]," and not "hostil[e]" toward Travis (Voss) (Pet. 11-12);

- petitioner "loved" Travis, "enjoy[ed]" his company, and treated him in a "fatherly" and "loving" fashion (Briggs-Delp) (Pet. 12-13);

---

standard of review in evaluating his suppression claim (Pet. 29-30) — provides no basis for habeas relief because petitioner does not allege any violation of his constitutional rights.  *See* 28 U.S.C. § 2254(a) (habeas relief may granted "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States").

- petitioner was "loving, compassionate, [and] caring" toward Travis (Nancy Abens) (Pet. 19);

- petitioner treated Travis with "love and affection" (George Abens) (Pet. 20);

- petitioner and Travis "had a loving relationship" (Grandgeorge) (Pet. 18);

- petitioner was "a very loving father" to Travis (Spoonmore) (Pet. 21).

5.   Pursuant to Rule 5(b) of the Rules Governing Section 2254 Cases in the United States District Courts, respondent states as follows:

   A.   Petitioner has exhausted his state-court remedies.

   B.   Petitioner's claim is not procedurally barred.

   C.   The doctrine of non-retroactivity is not relevant to petitioner's case because petitioner does not claim a violation of any newly recognized constitutional right.

   D.   Petitioner's federal petition is timely.

6.   Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, respondent has manually filed the following exhibits under separate cover with the Clerk of this Court:

   Exhibit A:   Transcript of September 18, 1998 Report of Proceedings, *People v. Zimmerlein*, No. 96 CF 536 (sentencing hearing);

   Exhibit B:   Petitioner's Brief, *People v. Zimmerlein*, No. 2-98-1600;

   Exhibit C:   State's Brief, *People v. Zimmerlein*, No. 2-98-1600;

   Exhibit D:   Petitioner's Reply Brief, *People v. Zimmerlein*, No. 2-98-1600;

   Exhibit E:   *People v. Zimmerlein*, No. 2-98-1600 (Ill.App.Ct. July 17, 2000) (unpublished);

Exhibit F:    Petition for Leave to Appeal, *People v. Zimmerlein*, No. 90029;

Exhibit G:    *People v. Zimmerlein*, 738 N.E.2d 935 (Ill. 2000) (denying leave to appeal);

Exhibit H:    Transcript of July 21, 2005 and September 28, 2005 Report of Proceedings, *People v. Zimmerlein*, No. 96 CF 536 (evidentiary hearing on postconviction petition);

Exhibit I:    Defense Group Exhibit 7, *People v. Zimmerlein*, No. 96 CF 536 (documents prepared by mitigation specialist) (filed September 28, 2005);

Exhibit J:    Order denying postconviction petition, *People v. Zimmerlein*, No. 96 CF 536 (October 7, 2005);

Exhibit K:    Petitioner's Brief, *People v. Zimmerlein*, No. 2-06-0035;

Exhibit L:    State's Brief, *People v. Zimmerlein*, No. 2-06-0035;

Exhibit M:    Petitioner's Reply Brief, *People v. Zimmerlein*, No. 2-06-0035;

Exhibit N:    *People v. Zimmerlein*, No. 2-06-0035 (Ill.App.Ct. July 30, 2007) (unpublished);

Exhibit O:    Petition for Leave to Appeal, *People v. Zimmerlein*, No. 105159;

Exhibit P:    *People v. Zimmerlein*, 882 N.E.2d 83 (Ill. 2008) (denying leave to appeal); and

Exhibit Q:    Trial transcript, *People v. Zimmerlein*, No. 96 CF 536.[2]

---

[2] Due to its large size, Exhibit Q is bound separately.

## RESPONSE TO PETITIONER'S CLAIM

**I.      Habeas relief should be denied because the state court correctly determined that counsel was not ineffective for failing to call these six witnesses at trial, and in any event the state court's determination was not unreasonable.**

To obtain habeas relief based on ineffective assistance of counsel, petitioner must show that counsel made an error so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment and that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). In addition, because the state court rejected this ineffective assistance claim on the merits, petitioner also must show that the state court's application of the *Strickland* standard was "unreasonable" in the sense that it was well outside the boundaries of permissible differences of opinion. *See* 28 U.S.C. § 2254(d)(1) (if claim was adjudicated on merits in state court, relief is available only if state court's decision "involved an unreasonable application" of Supreme Court law); *Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) ("unreasonable" means "something like lying well outside the boundaries of permissible differences of opinion"). Here, because petitioner cannot satisfy *Strickland* — and in any case cannot show that the state court applied *Strickland* unreasonably — habeas relief should be denied.

**A.     Counsel's decision not to call these six witnesses was not deficient performance.**

The state courts correctly determined that counsel's decision to elicit evidence suggesting that petitioner loved Travis solely through State witnesses such as Donnita and Kathleen was a reasonable tactical decision.  As counsel explained at the postconviction hearing, this strategy had four advantages: (1) Donnita, Kathleen, and Mari Elizondo had an opportunity to observe petitioner with Travis on a regular basis, giving them a strong basis of knowledge for their testimony; (2) Donnita and Kathleen were the two people closest to Travis and thus most affected by his death, making any pro-defense testimony elicited from them particularly powerful; (3) the fact that Donnita, Kathleen, and Elizondo were State witnesses may have given their testimony added credibility; and (4) the fact that Donnita and Kathleen were State witnesses made it unlikely that the State would attempt to impeach them.

The six uncalled witnesses, in contrast — assuming they would have testified at trial in accordance with their sentencing and postconviction hearing testimony — would have been unhelpful at best, and at worst thoroughly impeached.  First, as counsel noted, the State would have been able to impeach each witness based on the limited basis of their knowledge because each witness observed petitioner with Travis for only a brief period and only in a public place.  Second, the State would have been able to cross-examine each witness on their knowledge of the facts surrounding Travis's death, thereby reiterating for the jury the cruelty that

petitioner inflicted on Travis.  Any witness who expressed ignorance of those facts — as George Abens did at sentencing, and as Garland Spoonmore did at the postconviction hearing — would have appeared patently incredible, and any witness who first learned of those facts on cross-examination may well have changed his opinion of petitioner.  Moreover, any witness who insisted that petitioner never kicked Travis — as Beverly Briggs-Delp did at the sentencing hearing, and as George Abens did at both the sentencing and postconviction hearings — would have directly contradicted petitioner's own trial testimony.  In addition, because each of the uncalled witnesses was a friend of either petitioner or his mother, each witness would have been subject to impeachment based on bias.  Finally, any witness who offered testimony to the effect that a person who repeatedly kicks a small child is not a "menace to society" but instead a "loving parent" — as Briggs-Delp did at sentencing, and as Karol Grandgeorge did at the postconviction hearing — would in effect have impeached herself:  the jury would certainly have concluded that any witness who offered such absurd testimony would have been willing to say anything to help petitioner avoid a murder conviction.  Because, as counsel noted, the State would have had no disincentive to impeach these witnesses, and because the impeachment would have severely damaged petitioner's case, counsel's decision not to call these witnesses was wise, and the state court's conclusion that counsel's decision was not deficient performance was certainly not unreasonable.

**B.    Counsel's failure to call these six witnesses did not prejudice petitioner.**

Even assuming that counsel's decision not to call these six witnesses was deficient performance, and further assuming that the state court's contrary conclusion constituted an unreasonable application of *Strickland*, petitioner still would not be entitled to habeas relief because he cannot demonstrate that counsel's decision prejudiced him.  Because petitioner's ineffective assistance claim is based on counsel's failure to call witnesses, petitioner must show:  (1) what testimony those witnesses would have offered had they been called at trial; (2) that the witnesses' testimony would have been admissible; and (3) that the testimony would have created a reasonable probability of the jury acquitting petitioner of murder. *See Wright v. Gramley*, 125 F.3d 1038, 1044 (7th Cir. 1997) ("In the case of an uncalled witness, we have held that at the very least the petitioner must submit an affidavit from the uncalled witness stating the testimony he or she would have given had they been called at trial."); *United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987) (where habeas claim involves uncalled witnesses, petitioner must "demonstrate, with some precision, the content of the testimony they would have given at trial").  In addition, because the state court concluded that counsel's failure to call these witnesses was not prejudicial, petitioner must demonstrate that the state court's decision amounted to an unreasonable application of *Strickland*.  *See* 28 U.S.C. § 2254(d)(1).  Petitioner fails to make any of these showings.

**1.    Petitioner has not shown what testimony — if any — the six uncalled witnesses would have offered at trial.**

As an initial matter, petitioner's uncalled-witnesses claim fails because he offers no evidence whatsoever as to what testimony the uncalled witnesses would have offered at his trial. Petitioner's apparent assumption that the witnesses' trial testimony would have matched their postconviction hearing testimony is unfounded: witnesses are often more willing to provide pro-defense testimony *after* the defendant has been convicted. *See, e.g., Mendiola v. Schomig*, 224 F.3d 589, 593 (7th Cir. 2000) (noting that when "defendants and their friends . . . hound witnesses after trial[, w]itnesses . . . may protect themselves by telling defendants' friends (and lawyers) what they want to hear, knowing that [their statements] will not jeopardize an accurate verdict already delivered"). Accordingly, petitioner's failure to demonstrate the content of the testimony these witnesses would have provided at trial dooms his ineffective assistance claim. *See Wright*, 125 F.3d at 1044 (petitioner must offer evidence of what testimony uncalled witness would have offered at trial); *Cross*, 811 F.2d at 1016 (same).

**2.    Petitioner has not shown that the uncalled witnesses' testimony would have been admissible at trial.**

In addition — assuming for the sake of argument that the uncalled witnesses would have offered trial testimony equivalent to their postconviction hearing testimony — petitioner's claim fails because the uncalled witnesses' testimony would have been inadmissible. First, both the testimony that petitioner had affection for Travis (the "love" testimony) and the testimony that petitioner

20

occasionally performed basic childcare tasks in a non-abusive manner (the "caregiving" testimony) would have been barred as irrelevant.  Given petitioner's admission that he kicked Travis repeatedly — including once after Travis fell to the ground — and the undisputed medical evidence that petitioner's kicks caused Travis's death, the only question for the jury was whether petitioner knew that kicking Travis created a strong probability of great bodily harm.  *See* 720 ILCS 5/9-1(a)(2) (person who kills without lawful justification commits first degree murder if, in performing the acts which cause the death, "he knows that such acts create a strong probability of death or great bodily harm").  Whether petitioner "loved" Travis or treated him well *before* kicking him to death had no bearing on petitioner's knowledge; that determination turned instead on the evidence of the disparity in size and strength between petitioner (a strong, athletic, 200-pound man) and Travis (a sickly, 34-inch-tall three-year-old) and the undisputed medical evidence that petitioner kicked Travis with "tremendous force" in order to "blow out" Travis's stomach.  (Exh. E at 2-5, 7, 27-28; Exh. N at 1-2, 6, 8-9).  *See, e.g., People v. Rodriguez*, 655 N.E.2d 1022, 1029-30 (Ill.App. 1995) (defendant's knowledge that his actions will probably cause death or great bodily harm can be inferred from disparity in size and strength between victim and defendant and nature and severity of victim's injuries; collecting cases); *see also, e.g., People v. West*, 560 N.E.2d 594, 607 (1990) ("A three-month-old baby is a relatively fragile being. A full-grown man who violently shakes such an infant cannot help but be

aware that his actions create a strong probability of great bodily harm or even death."). The only case petitioner cites to suggest that this evidence would have been admissible — *People v. Lucas*, 548 N.E.2d 1003 (Ill. 1989) — is not to the contrary. *Lucas* held only that evidence of motive is admissible when the State argues that a killing was intentional. Here, because the State never argued that petitioner killed Travis intentionally, *Lucas* is inapposite, and both the "love" testimony and the "caregiving" testimony would have been excluded as irrelevant.

The testimony would have been barred on other grounds as well. The "love" testimony — regardless of how it was worded — would have been excluded because the witnesses lacked personal knowledge of petitioner's feelings for Travis. *See, e.g., People v. Peter*, 581 N.E.2d 128, 131 (Ill.App. 1991) ("[G]enerally, a witness may testify only to matters within his or her personal knowledge."). In addition, both the "love" testimony and the "caregiving" testimony — even assuming it had some minimal relevance and was otherwise admissible — would likely have been barred as cumulative of other evidence and likely to confuse the jury and waste time. *See, e.g., People v. Jackson*, 604 N.E.2d 1075, 1081 (Ill.App. 1992) (trial court may exclude evidence when its probative value is substantially outweighed by likelihood that it will confuse the issues, waste time, or duplicate other evidence). Because the uncalled witnesses' testimony would have been inadmissible for all of these reasons, petitioner cannot demonstrate prejudice from counsel's failure to call them.

###### 3. Petitioner has not shown that the uncalled witnesses' testimony would have created a reasonable probability that the jury would have acquitted him of murder.

Finally, and most importantly — even assuming that the uncalled witnesses would have testified at trial as they did at the postconviction hearing, and further assuming that their testimony would have been admitted — petitioner cannot show that the uncalled witnesses' testimony would have created a reasonable probability that the jury would have acquitted him of murder. First, as explained *supra* in section (I)(A), the witnesses' testimony would have been both patently incredible and thoroughly impeached. Second, as explained *supra* in section (I)(B)(2), the testimony could not possibly have influenced the jury's verdict because it had no bearing on the critical issue: whether petitioner knew that by kicking Travis he created a strong probability of great bodily harm. Indeed, the jury's verdict was inevitable given the strong circumstantial evidence that petitioner knew that kicking Travis was likely to cause serious injury. *See, e.g., Rodriguez*, 655 N.E.2d at 1030 (where defendant admitted striking two blows to abdomen of 36-inch-tall, 30-pound, three-year-old and doctor testified that child's injuries resulted from "significant force," evidence "overwhelmingly proved" that defendant acted with requisite mental state for first degree murder). Finally, petitioner's failure to challenge the state appellate court's factual finding on direct appeal that he "knew when he kicked Travis twice that his actions created a strong probability of death or great bodily harm" (Exh. D at 27-28) forecloses any prejudice argument: because petitioner "knew" that his actions posed a strong probability of great bodily harm,

the jury was *required* to convict him of murder.  *See* 28 U.S.C. § 2254(e)(1) ("a

determination of a factual issue made by a State court shall be presumed to be

correct"); 720 ILCS 5/9-1(a)(2) (person commits first degree murder if, in performing

acts which cause death, "he knows that such acts create a strong probability of

death or great bodily harm"); *Strickland*, 466 U.S. at 694-95 (prejudice inquiry

assumes that jury acted lawfully and excludes possibility of nullification).  For all of

these reasons, petitioner cannot demonstrate prejudice from counsel's failure to call

these six witnesses.

## **CONCLUSION**

For the foregoing reasons, habeas relief should be denied.


August 21, 2008                                    Respectfully submitted,

                                                   LISA MADIGAN
                                                   Attorney General of Illinois

                              By:    s/ Retha Stotts
                                     RETHA STOTTS, Bar #6270680
                                     Assistant Attorney General
                                     100 West Randolph Street, 12th Floor
                                     Chicago, Illinois 60601-3218
                                     TELEPHONE: (312) 814-0010
                                     FAX: (312) 814-5166
                                     E-MAIL: rstotts@atg.state.il.us

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on August 21, 2008, I electronically filed respondent's **Answer** with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system, which will send notice to the following CM/ECF user:

Frederick F. Cohn
Frederick F. Cohn Limited
35 East Wacker Drive
Suite 1525
Chicago, IL 60601.

           s/ Retha Stotts_____
           RETHA STOTTS, Bar #6270680
           Assistant Attorney General
           100 West Randolph Street, 12th Floor
           Chicago, Illinois 60601-3218
           TELEPHONE: (312) 814-0010
           FAX: (312) 814-5166
           E-MAIL: rstotts@atg.state.il.us